IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 02, 2013

**Tonya Andrews, As Admin. for the Estate of James Christopher Sprinkle &
Jacob Colton Sprinkle a minor by next friend and Guardian Tonya Andrews
v. Amy Sprinkle and Frank Wray**

**Appeal from the Circuit Court for Maury County
No. 13558      Stella L Hargrove, Judge**

---

**No. M2012-02242-COA-R3-CV - Filed September 30, 2013**

---

The basic issues in this appeal involve the valuation of a decedent's business at the time of his death. After the decedent died, the decedent's mother was appointed administratrix of his estate. She filed this lawsuit against the decedent's wife and the decedent's wife's brother, alleging that they had wrongfully disposed of virtually all of the decedent's property after his death, including his business assets, thereby rendering a proper administration of the estate extremely difficult if not impossible. Following a four-day bench trial, the trial court concluded that the defendants had wrongfully taken possession of the decedent's business assets and converted them to their own personal use. Relevant to this appeal, the court valued the decedent's business at $75,000, and it held that the defendants were jointly and severally liable to the estate for that amount. The defendants appeal, challenging only the amount of damages awarded by the trial court for the value of the business. After a careful review of the record, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Larry Samuel Peterson, Jr., Columbia, Tennessee, for the appellants, Amy Sprinkle and Frank Wray

L. Bruce Peden, Columbia, Tennessee, for the appellees, Tonya Andrews and Jacob Cole Sprinkle

OPINION

## I. FACTS & PROCEDURAL HISTORY

James Christopher Sprinkle ("Decedent") owned and operated a plumbing business called Rooter Drain and Plumbing ("Rooter"). He started the business around 2001 or 2002. Rooter eventually grew to serve a four-county area in Middle Tennessee, including Maury County, Marshall County, Giles County, and Lawrence County. Rooter acquired and operated at least two "box trucks" or "box vans" which were equipped with all the necessary tools for completing plumbing jobs. Besides Decedent, Rooter generally employed between one and three additional employees.

In October 2009, Decedent died as a result of a gunshot wound. The cause of death was ruled "undetermined." He was found inside his home by his wife, Amy. Decedent was thirty-five years old at the time of his death. Decedent was the father of one son, twelve-year-old Jacob, from a previous marriage.[1] Decedent had been married to his wife, Amy, for seven years, and she had three children from a previous marriage. Decedent, Amy, and the four children resided together in the marital home. Decedent operated the Rooter plumbing business from his home and two shops located on the property.

On the same day Decedent died, Amy and her three children left the marital home and went to live with her brother, Frank Wray.[2] Decedent's son, Jacob, went to live with his grandmother, Decedent's mother, Tonya Andrews. Neither Amy nor the children spent another night in the marital home after Decedent's death.

Months after Decedent's death, his mother, Mrs. Andrews, was appointed Administratrix for his estate. In October 2010, one year after Decedent's death, Mrs. Andrews filed this lawsuit against Decedent's wife, Amy, and her brother, Frank. Relevant to this appeal,[3] the complaint alleged that Decedent owned, at the time of his death, "a

---

[1] Jacob's mother died in a car accident when he was young, and he lived with Decedent and Amy full-time.

[2] Amy later changed her name from Amy Sprinkle to Amy Wray. To avoid confusion, we will simply refer to her as "Amy" throughout this opinion. For clarity, we will also refer to Amy's brother, Frank, simply as "Frank," because another brother, P.J. Wray, will also be discussed. We mean no disrespect by using these references.

[3] The complaint also alleged that the Decedent owned substantial personal property that had been wrongfully converted by the Defendants. In addition, Mrs. Andrews' complaint included a separate claim
(continued...)

successful and valuable plumbing business including substantial equipment, tools, vehicles, and the good will of the business." Defendant Frank Wray had been employed by Rooter prior to Decedent's death, and the complaint alleged that Frank had wrongfully taken possession of Decedent's plumbing business equipment, tools, vehicles and supplies after Decedent's death, without giving any consideration for such, and continued to operate the Decedent's plumbing business himself. The complaint alleged that Amy aided Frank in having all of the telephone numbers for Rooter transferred to Frank in order to capture the clientele and goodwill of Decedent's business. The complaint alleged that Decedent's plumbing business was a valuable and profitable going concern which could have been administered and sold as an asset of Decedent's estate, with the proceeds being available for the payment of claims against the estate and for distribution to the Decedent's heirs, including Jacob. Instead, the complaint alleged, Amy and Frank wrongfully sold, gave away, or disposed of virtually all of Decedent's vehicles and plumbing business tools and equipment. Mrs. Andrews alleged that, as Administratrix of Decedent's estate, she was entitled to possession of all property owned by Decedent at his death in order to properly administer his estate, and she claimed that she was entitled to a judgment against the defendants for their wrongful and unlawful conversion of the Decedent's property. Mrs. Andrews sought a judgment against the defendants for the value of all property that was wrongfully converted, sold, or otherwise disposed of after Decedent's death.

The defendants filed an answer in which they alleged that many of the disputed items were either stolen, repossessed, or sold by Amy in an effort to support herself after Decedent's death. The defendants claimed that Rooter was not a profitable business. The defendants also claimed that even if Rooter did have some value, then Amy would be entitled to an interest in the business as a marital or partnership asset, or in her position as surviving spouse.

A four-day bench trial was held April 9-12, 2012, before Judge Stella Hargrove. The trial judge heard from eight witnesses and received forty-four exhibits. Decedent's mother, Tonya Andrews, testified that she had enjoyed a very, very close relationship with Decedent and spoke to him nearly every day. She testified that Decedent started the Rooter Drain and Plumbing business in 2001. Mrs. Andrews testified that the number of employees simultaneously working for Rooter varied, with Decedent employing as few as one and as

---

[3](...continued)
on behalf of Jacob, filed by Mrs. Andrews as his next friend and guardian, to recover Jacob's personal property that was never recovered from the marital home. However, these claims involving personal property are not at issue in this appeal. The issues before us are limited to the claim regarding the value of Decedent's business. We will only discuss the personal property issues to the extent that they shed light on the parties' circumstances and the issues on appeal.

many as three additional employees at various times during its operation. Mrs. Andrews named at least seven employees who had worked for Rooter at different times. She described the business as successful and busy. Mrs. Andrews testified that Decedent advertised Rooter's services in several telephone books, including the Yellow Pages and several out-of-county publications. Rooter maintained four telephone numbers, one for each of the four counties it regularly served, and it advertised in all four counties. Mrs. Andrews identified Rooter's Yellow Page ad, which was in color and covered two full pages, and prominently featured Rooter's logo, "The All in 1 Plumber." Mrs. Andrews testified that Rooter also advertised via telephone, business cards and magnets, an Internet web page, and "word of mouth."

Mrs. Andrews identified photographs of a Rooter box truck that were taken by investigators the day Decedent died.[4] The truck displayed Rooter's name, logo, and a telephone number for each of the four counties it served. Mrs. Andrews said she did not know what happened to the box truck after Decedent died. Mrs. Andrews also identified a photograph of a 2007 Ford F-150 pickup truck with a camper over the back, which Decedent used at least part time in his business. This truck and another business truck owned by Decedent were repossessed after his death. Mrs. Andrews testified that Decedent maintained two shops behind his house and owned tools and equipment to equip his plumbing business.

Mrs. Andrews testified that she had been unable to locate any assets or bank accounts with available funds that would enable her to administer the Decedent's estate. In her capacity as personal representative of the estate, Mrs. Andrews had subpoenaed Decedent's tax records, bank statements, and telephone records in an effort to identify and locate Decedent's property. Mrs. Andrews testified that she had "exhausted every resource that [she] knew" and spent hundreds of hours reviewing those documents. Mrs. Andrews testified that Decedent's wife, Amy, did not provide her with any records or information regarding Decedent's business or his financial affairs, and that Amy would not respond to her calls or text messages. She testified that Amy had closed the Rooter bank account and other accounts belonging to Decedent after Decedent's death, and Decedent's house was sold through foreclosure. Mrs. Andrews testified that it was also difficult to trace Decedent's financial transactions because he often dealt with cash.

As noted above, Decedent died in October 2009. Mrs. Andrews testified that Decedent had not yet filed his 2008 income tax return at the time of his death because he had

---

[4] From our review of the photos, the front part of the vehicle looks like a full-sized van, but the back of the vehicle, starting behind the doors, looks like a large "box" with Rooter's name and information displayed on all four sides. The box extended to a height taller than the top of the van's cab. The back of the box contained a large vertically sliding door, similar to the back of a semi trailer or a moving truck.

sought a filing extension. The last income tax return filed by Decedent was for the 2007 tax year, and it reflected that Rooter had gross receipts of $186,233 in 2007. After deducting about $98,000 for depreciation on Decedent's real property (his shops) and his personal property, and deducting various other expenses, such as $37,793 for advertising and nearly $20,000 for various telephone bills, Decedent's tax return listed taxable business income of only $17,000. The tax return showed no other income for Decedent, Amy, the four children, or Amy's mother, who was also claimed as a dependent on the return. Because of this, Mrs. Andrews testified that she believed that Decedent's tax return was inaccurate and that it did not fully reflect the value of the Rooter plumbing business. Mrs. Andrews pointed out that Decedent owned a pool, a hot tub, a pool table, several four wheelers, four jet skis, a fishing boat, and a pontoon boat, and she opined that it would be impossible for Decedent to maintain such a lifestyle and support six dependents if Rooter was not a profitable business. Mrs. Andrews testified that she believed that Decedent was not reporting all of his income because he was paid in cash for many of his jobs. She also pointed out that Decedent's return was obviously inaccurate in the sense that it did not reflect any payments being made to Rooter's employees. Mrs. Andrews testified that she was unable to find any records for payments to employees. She described Decedent as "a very poor bookkeeper."

Decedent had submitted some documentation of his income and expenses for the 2008 tax year when he filed his application for a filing extension. According to these documents, Rooter's gross receipts for 2008 totaled $180,969. That year, Decedent spent $23,664 on Bell South advertising and $10,872 on advertising in another publication. Decedent listed total advertising costs of $51,492.

Mrs. Andrews testified that she attempted to calculate Rooter's income from 2009 "from what [she] had to go on." However, due to the lack of records, Mrs. Andrews was only able to calculate Rooter's income based upon how many checks had been written to Rooter by customers and deposited directly into Rooter's bank account. There was no record of customers' cash transactions or customers' checks that may have simply been cashed. Mrs. Andrews testified that she did not count as income any *cash* deposit into Rooter's account, even if she suspected that it was payment for a job, because she could not confirm the source of such funds. She also limited her calculation of Rooter's business income to checks from *customers*, and excluded checks from other sources, such as a $3,600 tax refund and $5,300 in checks from an insurance company. The checks from customers that were deposited into Rooter's bank account between January and September of 2009 totaled $47,291.57.

Mrs. Andrews was asked to testify as to her opinion regarding the value of Rooter as of the date of Decedent's death, based upon her knowledge of Rooter's business, tools, equipment, vehicles, and financial information. She was specifically asked to state her

opinion as to what a willing purchaser would have paid for the assets and goodwill of the business. Mrs. Andrews estimated that the total value of the company was between $100,000 and $150,000. She explained that her opinion was based in part upon a consideration of the checks written to Rooter in 2009 for labor, the vehicles Decedent had owned, the tools he owned, and the value of the assets he was depreciating on his tax returns. Mrs. Andrews noted that she had reviewed numerous documents regarding the tools purchased by Decedent, in addition to her personal observations of the tools in the past, and she estimated that he had "close to $200,000" invested in tools and equipment. She described one particular "locator" camera that Decedent used for running down into pipes and showing customers where blockages were located. She explained that the locator camera was purchased by Decedent for over $8,000. She testified that Decedent owned several rooter machines that "go down in the drains," all kinds of hand tools, electric tools, saws, drills, hammers, generators, sump pumps, vacs, and "just about every kind of tool imaginable." Aside from the tangible tools and equipment, Mrs. Andrews also pointed out that Rooter had "its name." She said that Decedent's advertising over the years had established a presence in the plumbing market. Mrs. Andrews testified that Decedent spent $7,000 per month on advertising for the business. She said that Decedent "built his business up" by "years and years of repeat calls and establishing rapport with his clients and being referred by them to other people."

Mrs. Andrews testified that after she was appointed as Administratrix of Decedent's estate, months after Decedent's death, she learned that Rooter still had listings and advertisements in various telephone books. At trial, she identified two telephone books, from 2011 and 2012, which listed Rooter's telephone numbers as the same numbers listed on Decedent's box truck. There was also a Yellow Page ad for Rooter listing the same telephone numbers. Mrs. Andrews testified that, as Administratrix, she was not involved with this advertising for Rooter in 2011 and 2012. Mrs. Andrews testified that she called one of the telephone numbers listed for Rooter in 2011 and heard an automated voice recording of her deceased son's voice. Mrs. Andrews testified that she subpoenaed the records for the telephone numbers from the telephone company, and she learned that all of the numbers had been transferred to Frank's wife, Melinda Wray (Amy's sister-in-law). Mrs. Andrews said that anyone who saw the Rooter ad and called the Rooter telephone number would continue to believe that they were dealing with Decedent's company. Mrs. Andrews testified that the actions taken by Frank (Amy's brother) after Decedent's death, such as the assumption of Rooter's expensive advertising and telephone bills, further evidenced the fact that Rooter was a valuable and successful business.

Mrs. Andrews acknowledged on cross-examination that Decedent was not working as much in 2009 (prior to his death in October) as he had worked in previous years. Amy's brother, P.J. Wray, was employed by Rooter, and he had a room at Decedent and Amy's house where he stayed for some time. P.J. Wray was found murdered outside the house in

2007. Decedent was the beneficiary of a life insurance policy on P.J.'s life, and Decedent was a suspect in the murder investigation, although charges were never filed against him. Decedent, Amy, and the children moved out of the marital home and into Mrs. Andrews' home for a period of several months after P.J. died. Decedent began seeing a psychiatrist, and at the time of his death, he was being prescribed 270 Xanax per month. Mrs. Andrews opined that Decedent was "overprescribed." Decedent received over $100,000 from P.J.'s life insurance policy in early 2009. Mrs. Andrews acknowledged that Decedent was partly living off of these life insurance proceeds in 2009. Decedent also gambled frequently. Mrs. Andrews was aware of the fact that Decedent had fallen behind on his advertising bill before his death, and she learned after Decedent's death that he was also about two months behind on his mortgage payment. Mrs. Andrews also learned that the Rooter bank account had a negative balance during June of 2009. The claims filed against Decedent's estate after his death totaled $7,056. Mrs. Andrews testified that one of the claims was filed by a Rooter customer whose plumbing service was not completed at the time of Decedent's death.

Mrs. Andrews testified that she believed that Amy and Frank had something to do with Decedent's death. She testified that both were investigated by the local sheriff's department and the Tennessee Bureau of Investigation, and that no charges were filed, but the official cause of death was ruled "undetermined."

Mrs. Andrews' husband, Greg Andrews, testified as well. He had been married to Mrs. Andrews since 2004, and he had known Decedent since about 2002. Mr. Andrews testified that he was familiar with the tools and equipment owned by Decedent in connection with his business because he had visited with Decedent at his home and observed them, and he had gone with Decedent on business calls on a couple of occasions when Decedent needed assistance. Mr. Andrews testified that Decedent's shops were "covered with tools and air compressors and stuff all over." According to Mr. Andrews, the Rooter plumbing business was well equipped and well tooled, and it was marketed and advertised in a professional and business-like fashion. Mr. Andrews testified that at one time Rooter operated two large box trucks. On cross-examination, Mr. Andrews admitted that Decedent was not working "as hard" in his business in 2009. Mr. Andrews said he had observed a change in Decedent's behavior after P.J. Wray's death in 2007, in that Decedent was worried about the ongoing investigation and the fact that he was a suspect. He noted that Decedent and Amy stayed at the Andrews' home for several months after P.J. died and said that he and his wife were trying to help Decedent and Amy "get over" losing P.J. and "get back on their feet."

Decedent's son, Jacob, testified as well. He was fifteen years old at the time of trial. He described Decedent's shop as having an air compressor and "just a bunch of tools." Regarding the events that transpired after Decedent's death, Jacob testified that he went to the house where he lived with Decedent and Amy on one occasion soon after Decedent died

in order to get clothes and a few other items, but he did not retrieve more of his belongings at that time because he assumed he would be returning. He testified that most of his clothing and other belongings were never retrieved from the house. Jacob testified that he saw one of Amy's children wearing his boots at school after Decedent died, and when Jacob confronted him, the boy said he had taken them from Jacob's room.

Several of Rooter's former employees testified as well. James "Bodie" Whitfield testified that he worked for Rooter for several months between 2004 and 2005. Mr. Whitfield testified that Rooter was busy during that time and operating two trucks. He named three other Rooter employees with whom he worked during that time period, aside from Decedent. Mr. Whitfield testified that he mostly worked on Rooter's jobs for residential customers but he worked on a few commercial jobs as well. Mr. Whitfield was a long-time friend of Decedent aside from their working relationship. When asked about Decedent's financial situation, he said, "He always had money on him." Mr. Whitfield recalled one occasion when he went to a gun show with Decedent, five to six months before he died, and Decedent had $10,000 in cash with him. When Mr. Whitfield was asked about his reaction to seeing Decedent with that much money, he said, "It wasn't unusual for [Decedent] at all."

The next Rooter employee to testify was Rusty Carpenter. He worked for Rooter from 2005 until at or near the time of Decedent's death in October 2009. Mr. Carpenter had previously worked for another plumbing business, but when that company's business "got slow," the owner referred him to Rooter, where Mr. Carpenter began working full-time. Mr. Carpenter testified that Rooter's business was busy, and that he would begin working at 7:00 or 7:30 a.m. each day, with a page of ten to fifteen calls that were scheduled for the day over four counties. Mr. Carpenter said he had also worked calls in five counties during one day. Mr. Carpenter testified that he had on occasion worked seven days per week, and well over forty hours. Mr. Carpenter said he received $500 cash per week for his salary, "week in week out," and that he might have received a check on two to four occasions throughout his years of employment. Mr. Carpenter acknowledged that Rooter's business "slowed down at the end a little bit, but," he added, "we was pretty busy [sic]." He admitted though that Decedent did not work "as much" in 2009.

Mr. Carpenter testified that he was not required to supply any of his own tools when he worked for Rooter. He said he did use his own hand tools out of personal preference, but that Decedent told him from the beginning that there was no need to bring anything because "there was a van fully stocked." Mr. Carpenter said the van contained hand tools, digging tools, camera tools, snake tools, and basically whatever was needed. Mr. Carpenter said Decedent also had "tools out the ying-yang" in the big shop behind his house. When asked how Rooter's tools and equipment compared with that owned by Mr. Carpenter's previous

employers in the plumbing business, Mr. Carpenter said that Rooter had "more than what I was used to." He said his previous employers did not have "the cameras, the C snakes, and stuff like that." Mr. Carpenter also said that his previous employers never had a vehicle comparable to Decedent's box van. He said "everything we needed was on that truck; everything. [Decedent] didn't want to get to a call and have to go back to Lowe's for parts, [so] we had it all on [the van]."

Mr. Carpenter testified that after Decedent died, he contacted Frank Wray about the personal tools that he had stored in the Rooter truck, and Frank told him that "everything had come up stolen." Mr. Carpenter testified that Rooter's box truck was moved to Frank's house after Decedent died.

Mr. Carpenter acknowledged that he and Decedent went gambling together on numerous occasions. He said that Decedent had attained a "seven-star" member rating at the casinos, which was "the best member you can be in the casino." He also claimed that Decedent won more than he lost. When asked where Decedent obtained his gambling money, Mr. Carpenter said, "That, I couldn't tell you. The man had a profitable business for six, seven, eight years, so I guess he had his own money." Mr. Carpenter noted that Decedent also owned guns, three or four jet skis, a few four wheelers, a motorbike, flat bottom boats, and vehicles that he would flip and sell.

The next witness to testify was Chaney Turnbo, who was Decedent's brother and Mrs. Andrews' son. He testified that he held a full-time job but worked for Rooter numerous times over the years when Decedent needed his assistance with big jobs or "odd and end things." Mr. Turnbo estimated that in 2008 and 2009, he worked for Rooter maybe once or twice a month. Mr. Turnbo described Decedent's plumbing equipment as follows:

> He had a lot of tools. He had power tools, hand tools, he had camera systems that he used to look down pipes with, he had drain cleaning tools which was used to clean out the drains with, snake machines of all different sizes, big ones, medium ones, small ones. Of course, all his hand tools, which is shovels and his pick axes and stuff like that. He had a lot of tools.

Mr. Turnbo stated that after P.J.'s death in 2007, Decedent "might have slowed down a little bit, but he was always working." Mr. Turnbo said that he knew of two box trucks that Decedent used regularly. He testified that after Decedent's death, he saw the "box" from one of the box trucks in a nearby town, with the Rooter logo still displayed on it, as if the box had been "stripped" from the truck.

Decedent's wife Amy also testified. She said that she did not know what equipment Decedent owned at the time of his death. She said that Decedent always swapped and traded things, throughout their marriage, such as equipment, boats, and "anything like that." She also claimed that Decedent "pawned several things" at "the end" because he needed money. Amy testified that there were several break-ins at the marital residence after Decedent's death, and because she was not living there at the time, she did not know "where everything went." Amy testified that she drove the Rooter box truck to Frank's house a couple of days after Decedent died because someone broke into it at the marital residence. She claimed that the first theft of tools and equipment occurred just "a couple of days" after Decedent's death. She claimed that when she returned to the house to pack, there "wasn't much to pack."

Amy testified that she transferred Rooter's telephone numbers to Frank's wife shortly after Decedent died because she was unable to pay the bills, and transferring the numbers "made sense" to her because Frank had plumbing experience. She said the numbers were set up in such a way that when any of the four telephone numbers received a call, the call would "roll over" to one phone. Amy said the numbers were transferred and put in the name of Frank's wife, "doing business as All-in-One Plumbing."

Amy was asked if she was in possession of any of Rooter's tools and equipment, and she responded that the box truck was at Frank's house and that she did not want it anymore. She said she did not, to her knowledge, have any of Rooter's tools. She stated, "I'm assuming they got taken along with the other stuff in the house and throughout the house and throughout the property." Amy testified that she did not know the whereabouts of a computer that Decedent used in connection with his business. She claimed that everything was stolen, right down to the dishes, the children's clothing, shoes, toys, televisions, and bedroom suites. She claimed that neither she nor her family members took Jacob's things, and that his property was at the house when she left in October and gone when she returned to move things out in February. Amy testified that she reported the thefts to the local sheriff's department, but she was unsure as to what action the sheriff's department took in response. Amy's attorney introduced a sheriff's department report that was filed in January 2010, three months after Decedent died, which stated that Amy reported "everything" being gone, including "numerous tools." With regard to the camera that Decedent used for Rooter, Amy testified that she recalled there being a camera "earlier on," and she described it as a fiberoptic, top-of-the-line, high grade camera. However, she suggested that Decedent might have gotten rid of it after P.J. died, or perhaps it was stolen when they were living at the property owned by Mrs. Andrews. Counsel for Mrs. Andrews then referred Amy to the sworn claim made against Decedent's estate by the Rooter customer, which stated:

> Run camera down sewer line. This was done to flush out sewer line. Supposed to replace a part of sewer line. There was roots. Not done. Job did

not get done.

According to the sworn claim, this was done on October 8, 2009, just six days before Decedent died. Amy then suggested that perhaps Decedent rented a camera for the job.

Amy conceded that the income Decedent earned from Rooter provided the vast majority of support for the family during the marriage, aside from some child support she received from her children's father, and her occasional babysitting and substitute teaching jobs. She said Decedent also "wheeled and dealed" on the side. She acknowledged that she and Decedent were able to provide financial assistance to other people, such as her mother. When asked where Decedent obtained his money, Amy said she assumed that it came from Rooter, but she did not question Decedent about his money. Amy said she did not know much about the family's finances, as she simply asked Decedent for money, without knowing the balance in their accounts. Amy was asked about the whereabouts of any bank statements, cancelled checks, or records that would have been maintained at the marital residence, and she conceded that they were there "at one point in time," but she denied having possession of them, stating, "so a lot of them were taken, gone through. I don't know – gone through by other people, not myself. . . . Whoever went through the house." She admitted that she closed all of the bank accounts after Decedent died but denied that there was any significant amount of money in them. Amy testified that she gave away the hot tub because it was broken, she disposed of the pool table because it was damaged, she sold the jet skis because they did not run, and the pontoon boat and Decedent's truck were repossessed after Decedent died.

Amy testified that she "trusted" Decedent during their marriage, but that she had since come to believe that he had something to do with her brother P.J.'s death. She said she did not take steps to administer Decedent's estate after he died because she did not understand the process and there was nothing left to administer. She said she believed that Rooter was worth nothing at the time of Decedent's death because she had seen "how bad it went down," and the tools were all stolen after Decedent died. According to Amy, the Rooter business started "slowly going down" in 2007 after P.J. died, and by 2009, Decedent "really went down," being unmotivated, unable to get out of bed sometimes, and "a lot of times" very depressed. Amy claimed that Decedent had run the business down with his pill habit, his gambling, and his unstable mental health. Amy said she did not know how much business Rooter was doing in 2009, but, she said that her understanding was that Frank was doing most of the work.

Frank Wray also testified. He admitted that the Rooter box truck was located behind his house. He testified that it was full of what he considered to be junk. Frank testified that he did not know what happened to the rest of Rooter's tools and equipment, other than that

it was stolen. Frank testified that the "box" from the second box truck was given to him, and he gave it away. Frank claimed that he was currently doing business as "All-in-One Plumbing," but he admitted to using the same four telephone numbers that were listed on the side of the Rooter box truck. He also acknowledged that Rooter had advertised with a logo that read, "The All-in-1 Plumber," and that he was using a similar slogan, "All-in-One Plumbing." However, Frank claimed that he had used that logo even before Decedent's death. He identified old invoices from work he had done in the past that displayed the All-in-One slogan.

Frank testified that Decedent did have a fiberoptic camera around the time of his death. Frank testified that he placed a padlock on the Rooter box truck on the day that Decedent died, but that someone had removed the lock when he returned to the house a couple of days later, and some of the tools were missing. Frank testified that he and Amy reported the thefts that occurred before the funeral, but that he was unable to obtain any reports to prove that they did in fact file reports. Frank denied having possession of any of Rooter's tools, and he said that he had never used the Rooter box truck.

Frank testified that he began working for Rooter full-time in February 2008. He testified that the pace of Rooter's work between February 2008 and the time of Decedent's death in October 2009 had "slowed way down." He said he "went from working all the time to he'll call me when he needs me." He suggested that the decline was due to Decedent's mental health, his use of pills and his gambling habit. Frank said that most of the time, Decedent was not there to run the business, and he suggested that the Rooter business was not on Decedent's mind.

After the four-day trial concluded, the trial court entered a thirteen page memorandum containing lengthy and detailed findings of fact and conclusions of law. The order contains the following findings that are directly relevant to the issues on appeal:

> At the time of [Decedent's] death, he owned real property, personal property and a plumbing business known as Rooter Drain & Plumbing (Rooter). The assets of Rooter were located on the property at 4395 Scott Hollow Road [the marital residence].
> . . . .
> Plaintiff submits the following issues to the Court:
> (1)    Are the business assets of Rooter subject to administration of the estate of [Decedent]? If so,
> (2)    Were the assets converted by Defendants? If so,
> (3)    What is the value of the assets? and
> (4)    Is the estate entitled to a judgment for the value of the business and its

assets?

. . . .

Although the value of certain personal property is no longer pursued by Plaintiffs, the Court finds that testimony concerning the location and disposition of certain property is relevant to show conduct and state of mind of Defendants surrounding the death of [Decedent], conduct and state of mind of Defendants surrounding the aftermath of [Decedent]'s death and credibility of Defendants as to disposition of personal property and related issues in the trial.

. . . .

It is Defendants' position that . . . all business assets were stolen from the property through no fault of [Amy] or [Frank], and moreover, that the business had no value at the time of [Decedent]'s death.

. . . .

Ms. Andrews testified that she was always familiar with how the business was run. She described his business as "busy" with employees ranging over the years from one to three. Ms. Andrews stated that [Decedent] advertised in the white pages of the local telephone book as well as the area telephone book, through business cards, a web page and by word of mouth. She testified that the business logo, "The All in 1 Plumber," was used by [Decedent] from the inception of the business.

Ms. Andrews testified that the assets of Rooter consisted of box trucks with the business information and logo printed on them, a truck for personal use as well as for business, two (2) shops situated on the same property as [Decedent]'s residence, various tools and equipment used in the plumbing business, including a $8,000 camera, hand tools, electric tools, saws, drills, generators, sump pumps and shop vacs. Andrews agreed that the last time she had seen this property [w]as prior to June 2009 when [Decedent] moved back into the residence.

Greg Andrews, Ms. Andrews' husband since 2004, also described his relationship with [Decedent] as very close. He testified that the shops were covered with tools; the business was well tooled and well equipped; at one time [Decedent] had two box trucks and one at death; his van was fully stocked and [Decedent] had more tools than anyone else he'd seen.

Three employees of [Decedent] testified: James Whitfield, Lance Carpenter and Chaney Turnbow. All three testified that the business was busy but had slowed down in 2009. All of them agreed that, except for very rare occasions, they were paid by [Decedent] in cash and that no 1099s were ever issued.

Mr. Whitfield testified as follows: He was now 37 years old and had

known [Decedent] since he was 13. In 2004 and 2005 the business was busy and was using two box trucks. [Decedent] always had cash on him, even up to $10,000 on one occasion.

Mr. Carpenter testified that he was now 31 years old and had known [Decedent] for five to seven years. He worked for him from 2005 until "a little before his death" in 2009. He worked full-time and drew a weekly cash salary of $500. He described the business as busy, beginning at 7:30 a.m., with 10 to 15 daily calls over four counties. The business had slowed down a little right before he left, but that [Decedent] had a profitable business. . . .

Mr. Turnbow testified as follows: He worked part-time for [Decedent] and worked off and on in 2009. [Decedent] had a lot of plumbing equipment and hand tools and he was busy – "always working." He had two box trucks at the time of his death. He later saw one of the boxes (removed from the truck) in Mt. Pleasant.

. . . .

**What happened to the business assets of Rooter?** [Frank] testified that the box truck is now at his house and that Ms. Andrews is welcome to come and get it.

[Amy] testified that she closed the business accounts with a balance of $200 to $300. She testified there were no other assets. She stated that in 2009 [Decedent] was suffering from mental problems and overdosing with pain killers. [Amy] testified that [Frank] was running the business. [Frank] agreed with this testimony. The Court has considerable difficulty with the credibility of both [Amy] and [Frank].

It is undisputed that [Decedent] was taking medication and was probably overmedicated. It is also undisputed that [Decedent] was a high rolling gambler in Tunica and Metropolis. It is also undisputed that [Decedent] was a very hard worker and provided a very good living for his family.

Both [Amy] and [Frank] testified that personal property was being removed from the property as soon as two days after the death of [Decedent]. They testified that these thefts were reported to law enforcement but that for some reason unknown to them, no reports are on file with the sheriff's department. This is difficult for the Court to reconcile.

[Frank] insisted that he padlocked the box trailer immediately after the death of [Decedent] when law enforcement was on the scene doing their investigation. He stated that he did not have a key to the padlock. [Frank] testified that not long afterwards the padlock was broken and things were stolen.

[Frank] inferred that someone might have even had a key to the

-14-

padlock, making it look like a theft. He denies taking any plumbing tools, and testified that the box removed from one of the trucks was given to him. [Frank] did not say specifically who gave him the box. He stated that he later gave the box away.

It is undisputed that [Frank] and [Amy] removed numerous personal items from the property right after the death of [Decedent]. These include 4-wheelers, jet skis, a fishing boat, washer and dryer in the shed, and personal items of [Amy] and her children. On February 20, 2010, [Amy] rented a U-Haul to remove the rem[a]inder of the property. She testified that the house had been ransacked, with locks busted off the door frames.

The Court has difficulty with the credibility of [Frank] in describing the personal property he said belonged to him, and does not believe him at all relative to [Decedent]'s fishing boat, described to the Court by Ms. Andrews as [Decedent]'s pride and joy. The Court has credibility [sic] with the testimony of [Amy] relative to the thefts of personal property of Jacob, herself and her children, as well as the condition of the personal property and its disposition during the marriage, prior to and after [Decedent]'s death.

The Court flat out does not believe [Frank]'s testimony relative to a lawnmower . . . . While this is not property of the estate of [Decedent], the Court finds that the actions and testimony of [Frank] surrounding this property speak volumes about his credibility.

Also the Court flat out does not believe the testimony of [Frank] relative to [another matter]. . . . While this incident is not relevant to the issues in the case, the Court finds that it is relative to [Frank]'s credibility. The Court finds that [Frank]'s recollection of most things, excluding negative issues surrounding [Decedent]'s personal and business life, is dim. The same is true for [Amy]. When her recollection became dim, [Amy] would testify repeatedly, "I trusted him." These are the same two people who have held [Decedent] responsible for the death of their brother, P.J. Wray, since October 29, 2007.

The Court finds that [Amy] and [Frank] removed all personal property, including business assets, which they considered valuable, right after [Decedent]'s death, that no reports of theft were filed immediately after the death of [Decedent]. The Court finds that they are not telling the truth relative to securing the property and the thefts supposedly occurring immediately after [Decedent]'s death. Any later reports of theft were filed to cover their actions.

. . . .

**B. Business assets and goodwill are subject to administration by the personal representative:** The Court finds pursuant to Tenn. Code Ann. § 31-2-103, upon qualifying as Administratrix, the personal property of

[Decedent] was vested in her for the purpose of first paying administrative expenses, taxes and funeral expenses, and then for the payment of all other debts and obligations of [Decedent]. After payment of debts and charges against the estate, Ms. Andrews was obligated to then distribute the personal property in accordance with the laws of intestate succession. Of course, [Amy] would be entitled to 50% and Jacob, 50%.

Ms. Andrews testified that she, with the help of her mother, paid for the funeral. Valid claims against the estate include: $1,500 filed by Jennifer B[.] for pre-paid plumbing services not performed; $272.25 by Amber Electric and Plumbing Supply; $663.88 by Capital One; and two claims filed by HSBC Bank c/o DCM Services, one for $969.08 and another for $3,651.09. These total $7,056.30.

The Court finds that at the time of [Decedent]'s death he owned plumbing supplies, tools and equipment as described by Ms. Andrews. After his death, [Amy] transferred all telephone numbers of the business in four counties to the wife of [Frank] in exchange for her paying the outstanding bill for the phones. After his death, [Frank] continued the business just like it was his own with the same telephone numbers. The logo he uses for the business is "The All in 1 Plumber." [Frank] testified that initially he and [Decedent] came up with the logo, "The All in 1 Plumber." The Court does not believe [Frank]. The logo used by [Frank] is deceptively similar to the logo used by [Decedent] in operating Rooter since 2001.

[Frank], with the assistance of [Amy] in getting the telephone numbers in his possession, continued to use the same telephone numbers and essentially the same logo. This tells the Court that Defendants believed Rooter had some value at [Decedent]'s death.

The Court finds that Rooter, owned and operated by [Decedent] since 2001, was a valuable business for a number of years. It continued to have value at the time of [Decedent]'s death.

The Court finds that the business and its assets are subject to administration.

**C. Defendants are guilty of conversion of the business property and assets and are jointly and severally liable to the estate:**

. . . .

The Court finds that both Defendants took possession of all business assets of Rooter and converted the assets to their own personal use, with no accounting whatsoever for the assets to the Administratrix.

**D.    Value of the business and assets of Rooter:** Ms. Andrews testified that the value of the business and assets was between $100,000 to $150,000. [Amy] claims that the business had no value. . . .

-16-

Trial Exhibit No. 5 is the only income tax return in the record and the best documentary evidence reflecting the gross receipts of the business, depreciation and expenses. At [Decedent]'s death, the income tax return for 2008 had not been filed. Trial Exhibit No. 11 is an Application for automatic extension of time to file the 2008 return. Attached to the application are [Decedent]'s figures showing gross receipts of $180,969.88 for 2008, as well as costs of advertising and expenses for phones, vehicles, utilities, materials, insurance, etc. Trial Exhibit No. 43 reflects gross receipts of the business for the first three quarters of 2009 to be $47,291.57. No expenses are listed. Ms. Andrews testified that this was the best information she could find in gathering records about the business. She testified that [Amy] provided absolutely no assistance with anything concerning the estate.

The 2007 income tax return reflects gross receipts of $186,233. Depreciation was listed at $1,757. Attachments to Form 4562 reflect assets being depreciated and placed into service from 2003 to 2005. The cost of each asset is reflected as well as prior depreciation for those years ($25,898, $7,165 and $373 respectively). Total cost of these assets is $38,179. Added to this is the cost of the shops put into service in 2005 of $60,000. Prior depreciation for the shops totals $3,012.

Figures attached to the 2008 extension show some $5,200 difference in gross receipts from 2007. Vehicle expenses and advertising expenses appear to be greater for 2008 than in 2007, while the remaining expenses for the two years are similar.

While the Court recognizes that the gross receipts for 2009 may not be accurate, Ms. Andrews' total of $47,292 is approximately 35% less than three quarters of gross receipts for 2008 (the Court divided $180,970 by 4 quarters ($45,242.50) and then multiplied this by three quarters ($135,727.50), compared to $47,292 for the first three quarters of 2009[)].[5]

Pursuant to Tenn. R. Evid. 701(b) Ms. Andrews, as Administratrix of the estate, is competent to testify as to the value of the personal property. Admittedly she had not viewed the business assets since right before June of 2009.

In determining the value of the assets, the Court is considering the

_____

[5] On appeal, neither party mentions this calculation by the trial court. We note that the calculation is inaccurate to the extent that it states that the 2009 total for three quarters ($47,292) was "approximately 35% *less than*" the 2008 total for three quarters ($135,727.50). In fact, the 2009 total of $47,292 for three quarters was only 35% of the total for three quarters of 2008, meaning that it was 65% *less than* 2008. In any event, the trial court noted that Mrs. Andrews' calculation of the income for 2009 was likely inaccurate due to the lack of records, and this calculation by the trial court was not mentioned again during its findings. Because the parties do not mention it on appeal, we will not discuss the issue further.

testimony of the parties and prior employees of [Decedent], as well as the attachments to Depreciation Schedules of the 2008 [sic] income tax return of the business reflecting the cost of various machines, [the] computer, vehicles and other plumbing-related equipment put into operation or otherwise used in the business from 2003 to 2005. The cost totals some $38,000. The proof showed that immediately after [Decedent]'s death, two vehicles used in the business; a Ford truck and a Dodge Durango, were repossessed. The Court finds the value of the business assets to be $25,000 at the time of [Decedent]'s death.

In considering the value of goodwill of the business, the Court is primarily looking to the testimony and actions of [Frank], as well as the testimony of Ms. Andrews and the prior employees of [Decedent]. The Court finds the testimony of each of these individuals to be far more credible than that of [Frank]. Every witness to the case, excluding [Frank] and [Amy], described the business as a busy one. The 2007 income tax return and the attachments to the Application for extension for 2008, confirm this. The Court finds that Ms. Andrews was handicapped in gathering records and information for the first three quarters of 2009. To a great extent, the Court holds [Amy] responsible for this. After all, [Amy] is insistent that she was a full and equal partner of the business and its operation. She absolutely refused to cooperate with Ms. Andrews.

The Court does find that the business was slowing down in 2009. However, immediately after [Decedent]'s death, [Frank], with the assistance of [Amy], took possession of all assets, using all existing business telephone numbers of Rooter in four counties and operating his plumbing business with a logo deceptively similar to that of Rooter. The Court finds the value of the goodwill of the business to be $50,000.

The estate is entitled to a judgment of $75,000 against the Defendants, jointly and severally. The attorneys may agree on the impact of the judgment, if any, as to [Amy]'s rights under intestate distribution, after payment of all debts and charges against the estate. If the attorneys cannot agree, they may submit this issue to the Court.[6]

The trial court's memorandum was incorporated into a judgment filed on June 22, 2012, which awarded a $75,000 judgment to Mrs. Andrews as Administratrix of Decedent's estate.

---

[6] The trial court made several other direct findings regarding Amy's credibility. With regard to several specific instances of Amy's testimony, the court stated that it had "difficulty with the credibility of [Amy]," had "difficulty with [Amy's] testimony," found that she was "greatly stretching the truth," and, quite frankly, the order stated, "The Court does not believe [Amy]."

The order stated, "All issues as to whether or not Defendant, [Amy], is entitled to distribution from the estate of [Decedent] are reserved for adjudication in the estate proceeding pending in Maury County Chancery Court." Defendants filed a motion for new trial and to alter or amend, which was denied. Defendants then filed a notice of appeal to this Court.

## II.    ISSUES PRESENTED

Defendants present the following issues for review on appeal:

1.    Whether the trial court erred in awarding $25,000 in damages for the value of the business equipment of Rooter Drain and Plumbing that was allegedly converted by Defendants;

2.    Whether the trial court erred in awarding $50,000 in damages for the value of the goodwill of Rooter Drain and Plumbing that was allegedly converted by Defendants; and

3.    Whether Amy is entitled a reduction in the damage award against her, in the amount of fifty percent, because she would have owned one-half of the property allegedly converted under the laws of intestate succession.

For the following reasons, we affirm the decision of the circuit court in all respects.

## III.    STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the resolution of the issues in a case depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC*, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002). "The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *Id.* We review the amount of damages awarded by the trial court as a question of fact, subject to the standard of review set forth in Rule 13(d). *Cofer v. Harris*, No. E2011-00242-COA-R3-CV, 2012 WL 112581, at *8 (Tenn. Ct. App. Jan. 12, 2012) (citing *Beaty v. McGraw*, 15 S.W.3d 819, 829 (Tenn. Ct. App. 1998)); *Moody v. Lea*, 83 S.W.3d 745, 751

(Tenn. Ct. App. 2001). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

### A. *Business Assets*

On appeal, Defendants argue that Mrs. Andrews failed to present sufficient evidence regarding the value of Rooter's tangible business assets that would enable the trial court to make a fair and reasonable assessment of damages. Defendants basically argue that the amount of damages was speculative and that the proof presented "[did] not provide a measure of reasonable certainty" as to the value of Rooter's tangible assets. They concede that Mrs. Andrews was competent to testify as to the value of Rooter's assets, as Administratrix of Decedent's estate.[7] However, they claim that the trial court should have given no weight to her opinion. Defendants claim that Mrs. Andrews failed to prove exactly what business property was owned by Decedent at his death, and they note that there was no itemized list of business assets presented to the trial court. They also claim that it was error for the trial court to rely upon Decedent's tax returns to establish the value of the equipment when Mrs. Andrews acknowledged that she believed them to be inaccurate in some respects. Defendants claim that the only value that was proven with reasonable certainty was that of the camera, which Mrs. Andrews valued at around $8,000 when it was new.

"The party seeking damages has the burden of proving them." ***Overstreet v. Shoney's, Inc.***, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999). However, there is a distinction between the measure of proof necessary to prove the existence of damages and that necessary to prove the amount of damages. ***Discover Bank v. Morgan***, 363 S.W.3d 479, 496 (Tenn. 2012). "The *existence* of damages cannot be uncertain, speculative, or remote." ***Hannan v. Alltel Publishing Co.***, 270 S.W.3d 1, 10 (Tenn. 2008) (emphasis in *Hannan*) (citing *Overstreet*, 4 S.W.3d at 703; *Cummins v. Brodie*, 667 S.W.2d 759, 765 (Tenn. Ct. App. 1983)). "The

---

[7] *See **In re Estate of Emberton***, No. M2010-01125-COA-R3-CV, 2010 WL 5341916, at *4 (Tenn. Ct. App. Dec. 20, 2010) ("In Tennessee, a property owner may offer opinion testimony on the value of his or her property without showing any special qualifications. Tenn. R. Evid. 701(b). This Court has previously opined that, 'the conservator of an absent or deceased party's property stands in the shoes of the absent or deceased party and, therefore, may testify with regard to the value of the absent or deceased party's property under Tenn. R. Evid. 701(b).' *Levine v. March*, 266 S.W.3d 426, 440 n. 15 (Tenn. Ct. App. 2007) (citations omitted). Likewise, Plaintiffs, as co-Administrators of the Decedent's Estate, took legal title of the Decedent's personal property in trust for the purpose of administration of the Estate; therefore, they were competent to testify as to the value of the personal property pursuant to Tenn. R. Evid. 701(b).")

*amount* of damages may be uncertain, however, if the plaintiff lays a sufficient foundation to allow the trier of fact to make a fair and reasonable assessment of damages." *Id.* (emphasis in *Hannan*) (citing *Overstreet*, 4 S.W.3d at 703; *Western Sizzlin, Inc. v. Harris*, 741 S.W.2d 334, 336 (Tenn. Ct. App. 1987); *Cummins*, 667 S.W.2d at 765). "Otherwise, in certain instances, the courts would be powerless to help some wronged parties." *Cummins*, 667 S.W.2d at 765.

Proof as to the amount of damages "need not be exact or mathematically precise." *Overstreet*, 4 S.W.3d at 703. "Rather, the proof must be as certain as the nature of the case permits and must enable the trier of fact to make a fair and reasonable assessment of the damages." *Id.* "When there is substantial evidence in the record and reasonable inferences may be drawn from that evidence mathematical certainty is not required." *Cummins*, 667 S.W.3d at 765. "Determining the amount of damages is not controlled by fixed rules of law or mathematical formulas, but is instead left to the sound discretion of the trier of fact. *Overstreet*, 4 S.W.3d at 703; *see also* **BancorpSouth Bank, Inc. v. Hatchel**, 223 S.W.3d 223, 230 (Tenn. Ct. App. 2006) ("the evidence upon which a party relies to prove damages must be sufficiently certain to enable the trier of fact, using its discretion, to make a fair and reasonable assessment of damages").

In the case at bar, the trial court found that Decedent owned the Rooter plumbing business at the time of his death and that Rooter's assets were located on the property at the marital home. The court noted Mrs. Andrews' testimony that "the assets of Rooter consisted of box trucks with the business information and logo printed on them, a truck for personal use as well as for business, two (2) shops situated on the same property as [Decedent]'s residence, various tools and equipment used in the plumbing business, including a $8,000 camera, hand tools, electric tools, saws, drills, generators, sump pumps and shop vacs." The court then found that "at the time of [Decedent]'s death he owned plumbing supplies, tools and equipment as described by Ms. Andrews." The court found that "[Amy] and [Frank] removed all personal property, including business assets, which they considered valuable, right after [Decedent]'s death," and "they [were] not telling the truth relative to securing the property and the thefts supposedly occurring immediately after [Decedent]'s death."[8] The court noted that the cost of Rooter's assets that were listed on the depreciation worksheet attached to Decedent's 2007 income tax return totaled $38,179. The trial court's order then stated,

---

[8] We note that Defendants also argue that the trial court's valuation of Rooter's business assets was erroneous because Amy and Frank testified that there were numerous thefts after Decedent died, and Amy claimed that Decedent was pawning "things" before he died. The trial court simply did not believe this testimony of Amy or Frank, and there is nothing in the record that would cause us to second-guess the trial court's assessment of credibility. Therefore, we find that the cited testimony does not undermine the trial court's valuation of the business assets.

In determining the value of the assets, the Court is considering the testimony of the parties and prior employees of [Decedent], as well as the attachments to Depreciation Schedules of the 2008 [sic] income tax return of the business reflecting the cost of various machines, computer, vehicles and other plumbing-related equipment put into operation or otherwise used in the business from 2003 to 2005. The cost totals some $38,000. The proof showed that immediately after [Decedent]'s death, two vehicles used in the business; a Ford truck and a Dodge Durango, were repossessed. The Court finds the value of the business assets to be $25,000 at the time of [Decedent]'s death.

Considering the unique circumstances of this case, we find that Mrs. Andrews offered the best evidence available to her as to the value of Rooter's business assets. Obviously there was no itemized list of assets, aside from those listed on the depreciation schedule of Decedent's tax return, which Mrs. Andrews submitted into evidence and the trial court clearly considered.[9] After reviewing every source of information Mrs. Andrews could locate, she gave her best estimate as to the value of Rooter's tools and equipment. She testified that she believed that Decedent had nearly $200,000 invested in tools and equipment. Clearly, the trial court did not accept Mrs. Andrews' estimation outright, but awarded only $25,000 for the value of Rooter's business assets at the time of Decedent's death. The only alternative measure of damages suggested by Defendants on appeal is $8,000, representing the value of a single camera, which is clearly unreasonable under the facts of this case. Under the circumstances presented, which were brought about by the conduct of Defendants, we find that Mrs. Andrews submitted proof that was "as certain as the nature of the case permit[ted]," and that the evidence was sufficient to "enable the trier of fact to make a fair and reasonable assessment of the damages." *See Overstreet*, 4 S.W.3d at 703. It was simply impossible to prove damages in this case to a mathematical certainty, due to Defendants' conduct, but that fact does not preclude Mrs. Andrews from recovering damages. *See Cummins*, 667 S.W.3d at 765 ("When there is substantial evidence in the record and reasonable inferences may be drawn from that evidence mathematical certainty is not required.") We find no error in the trial court's valuation of Rooter's business assets at $25,000.

---

[9] The depreciation schedule only included assets acquired between 2003 and 2005. It listed five rooter machines with a total cost of $5034, a $1277 computer, an $8300 camera monitor, a $430 Dewalt kit, a $526 concrete saw, a $316 chainsaw, "roll ramps" that cost $113, a $369 truck shelf, a $450 water pump, a $1250 cable machine, and four vehicles: a 1998 van that cost $4961, a 1999 Ford van that cost $9126, a 1997 Dodge van that cost $2187, and a 1997 Ford truck that cost $3840.

### B. Goodwill

Next, Defendants challenge the trial court's decision to value the goodwill of the Rooter plumbing business at $50,000. First of all, Defendants argue that the trial court erred in making any award at all for the value of the goodwill of the business because, Defendants argue, "the estate cannot own the goodwill" in the form of a separate property interest. As support for its argument, Defendants point to several divorce cases in which courts have held that the goodwill of a business is not a separate property interest of a type that can be included as part of the marital estate to be divided between spouses. *See*, *e.g.*, *Hazard v. Hazard*, 833 S.W.2d 911 (Tenn. Ct. App. 1991); *Smith v. Smith*, 709 S.W.2d 588 (Tenn. Ct. App. 1985). Defendants argue that "this same principle should be applied in the valuation of a plumbing business in the present case."

Defendants do not cite to any location in the record to suggest that they raised this argument in the trial court. From our recollection of the lengthy trial transcript, Defendants disputed the *value* of the goodwill of the business, but they did not suggest that goodwill was not an appropriate element of damages. In any event, we find their argument on appeal to be unconvincing. "'Good will is a property right which may be sold.'" *T.H. Engineering & Mfg., Inc. v. Mussard*, No. E2001-02406-COA-R3-CV, 2002 WL 1034029, at *2 (Tenn. Ct. App. May 23, 2002) (quoting *Young v. Cooper*, 30 Tenn.App. 55, 73, 203 S.W.2d 376, 384 (Tenn. Ct. App. 1947)). In *Hogan v. Coyne Intern. Enterprises Corp.*, 996 S.W.2d 195, 198 (Tenn. Ct. App. 1998), for example, the parties executed a series of agreements whereby one company purchased the assets of another company, including its inventory, trade name, customer contracts, and goodwill. Goodwill is a type of property interest that "is transferable and may be bought and sold in connection with the sale of a business; however, it cannot be transferred apart from the business with which it is connected." 38 Am. Jur. 2d *Good Will* § 6. The reason for the courts' reluctance at attempting to equitably divide the goodwill of a business in the process of dividing a marital estate was explained in *Hazard*, 833 S.W.2d at 915 (quoting *Smith*, 709 S.W.2d at 591-92):

> [Goodwill] cannot be separately sold or pledged by the individual owners. . . .
> * * *
> There is a disturbing inequity in compelling a professional practitioner to pay a spouse a share of intangible assets at a judicially determined value that could not be realized by a sale or another method of liquidating value.

In *McKee v. McKee*, No. M2009-01502-COA-R3-CV, 2010 WL 3245246, at *3 (Tenn. Ct. App. Aug. 17, 2010), this Court noted the different methods of valuing a professional business in a buy/sell setting versus in a divorce case when dividing the marital estate. "[P]ersonal goodwill cannot be a component in the valuation of a professional practice in an equitable

distribution of a marital estate." *Id.* at *5. However, we reject Defendants' suggestion that goodwill is not a property interest under any circumstance and that it "does not have any value" to Decedent's estate under the circumstances of this case. Unlike the divorce cases cited by Defendants, here, there is no "disturbing inequity" in compelling Defendants to pay the estate for the full value of the Rooter business, as a going concern, including its goodwill. Obviously, the value of the Rooter business at the time of Decedent's death was not limited to the value of the tools and equipment it owned. Rooter had value over and above that amount because of its name, its reputation, its established presence in the plumbing market in four counties, its established customers, and its former success over the past eight years. *Young*, 30 Tenn.App. at 73, 203 S.W.2d at 384 (describing the factors involved in the goodwill of a business). The value of Rooter's goodwill is perhaps best illustrated by the actions of Defendants themselves. Defendants not only took possession of Rooter's tools, equipment, and box truck, but they also continued to operate the plumbing business using the same four telephone numbers, the same advertising methods, and practically the same slogan and logo, in a clear effort to take advantage of Rooter's name and reputation. As Mrs. Andrews noted during her testimony, anyone who saw the Rooter advertisement and called the Rooter telephone number would believe that they were dealing with Decedent's established company. Frank essentially "stepped into the shoes" of Decedent and continued to operate the Rooter business as his own. Defendants benefitted from their wrongful "takeover" of a profitable business, and compensating Decedent's estate for the value of the tools alone would not provide an adequate remedy under the circumstances. Therefore, we find that the trial court appropriately considered the value of the goodwill of the Rooter plumbing company when awarding damages to Decedent's estate.

Now, we turn to the trial court's valuation of Rooter's goodwill at $50,000. Defendants contend that Rooter was worth nothing because its business was declining in 2009, and Decedent was gambling, taking pills, and a suspect in a murder investigation. We again find many of Defendants' arguments unconvincing because they are based upon the testimony of Frank and Amy, which the trial court expressly discredited.[10] We recognize that it is undisputed that Rooter's business was slowing down somewhat in 2009, but the trial court

---

[10] As noted above, the trial court's order stated:

. . . [Amy] stated that in 2009 [Decedent] was suffering from mental problems and overdosing with pain killers. [Amy] testified that [Frank] was running the business. [Frank] agreed with this testimony. The Court has considerable difficulty with the credibility of both [Amy] and [Frank].

It is undisputed that [Decedent] was taking medication and was probably overmedicated. It is also undisputed that [Decedent] was a high rolling gambler in Tunica and Metropolis. It is also undisputed that [Decedent] was a very hard worker and provided a very good living for his family.

expressly took note of this fact when valuing Rooter's goodwill. The trial court also took into account the figures listed on Decedent's income tax return and other tax related documents, as well as the testimony of various witnesses whom the trial court found to be "far more credible" than Defendants. The trial court's findings bear repeating here:

[Frank], with the assistance of [Amy] in getting the telephone numbers in his possession, continued to use the same telephone numbers and essentially the same logo. This tells the Court that Defendants believed Rooter had some value at [Decedent]'s death.

The Court finds that Rooter, owned and operated by [Decedent] since 2001, was a valuable business for a number of years. It continued to have value at the time of [Decedent]'s death.

. . . .

**D. Value of the business and assets of Rooter:** Ms. Andrews testified that the value of the business and assets was between $100,000 to $150,000. [Amy] claims that the business had no value. . . .

Trial Exhibit No. 5 is the only income tax return in the record and the best documentary evidence reflecting the gross receipts of the business, depreciation and expenses. At [Decedent]'s death, the income tax return for 2008 had not been filed. Trial Exhibit No. 11 is an Application for automatic extension of time to file the 2008 return. Attached to the application are [Decedent]'s figures showing gross receipts of $180,969.88 for 2008, as well as costs of advertising and expenses for phones, vehicles, utilities, materials, insurance, etc. Trial Exhibit No. 43 reflects gross receipts of the business for the first three quarters of 2009 to be $47,291.57. No expenses are listed. Ms. Andrews testified that this was the best information she could find in gathering records about the business. She testified that [Amy] provided absolutely no assistance with anything concerning the estate.

The 2007 income tax return reflects gross receipts of $186,233. . . .

Figures attached to the 2008 extension show some $5,200 difference in gross receipts from 2007. Vehicle expenses and advertising expenses appear to be greater for 2008 than in 2007, while the remaining expenses for the two years are similar.

While the Court recognizes that the gross receipts for 2009 may not be accurate, Ms. Andrews' total of $47,292 is approximately 35% less than three quarters of gross receipts for 2008 (the Court divided $180,970 by 4 quarters ($45,242.50) and then multiplied this by three quarters ($135,727.50), compared to $47,292 for the first three quarters of 2009.

. . . .

In considering the value of goodwill of the business, the Court is

primarily looking to the testimony and actions of [Frank], as well as the testimony of Ms. Andrews and the prior employees of [Decedent]. The Court finds the testimony of each of these individuals to be far more credible than that of [Frank]. Every witness to the case, excluding [Frank] and [Amy], described the business as a busy one. The 2007 income tax return and the attachments to the Application for extension for 2008, confirm this. The Court finds that Ms. Andrews was handicapped in gathering records and information for the first three quarters of 2009. To a great extent, the Court holds [Amy] responsible for this. After all, [Amy] is insistent that she was a full and equal partner of the business and its operation. She absolutely refused to cooperate with Ms. Andrews.

The Court does find that the business was slowing down in 2009. However, immediately after [Decedent]'s death, [Frank], with the assistance [Amy], took possession of all assets, using all existing business telephone numbers of Rooter in four counties and operating his plumbing business with a logo deceptively similar to that of Rooter. The Court finds the value of the goodwill of the business to be $50,000.

We cannot say that the evidence preponderates against the trial court's award of damages. Rooter was a profitable business with proven success over the past eight years. It consistently incurred extraordinary advertising expenses during that time in order to establish a presence in the plumbing market in at least four counties. According to the tax documents, Decedent spent $37,793 on advertising for Rooter in 2007 and $51,492 in 2008. Mrs. Andrews testified that Decedent also "built his business up" by "years and years of repeat calls and establishing rapport with his clients and being referred by them to other people." Practically every witness, except Defendants, described the business as busy. Having reviewed voluminous documents pertaining to the company, Mrs. Andrews estimated that a willing purchaser would have paid between $100,000 and $150,000 for the assets and goodwill of the business.[11] Rooter had gross receipts of $186,233 in 2007, $180,969 in 2008, and at least $47,292 directly traceable to checks written by customers for the first three quarters of 2009. Defendants claim that Rooter was worth "nothing," yet they chose to continue operating the business using Rooter's name and telephone numbers after Decedent died. Defendants certainly would not have continued to advertise Rooter's services if they believed that its reputation was worth nothing. "[I]n a bench trial, 'we review the amount of damages awarded by the trial court with the presumption that it is correct, and we will alter the amount of damages only when the trial court has adopted the wrong measure of damages or when the evidence preponderates against the amount of damages awarded.'" *Moody*, 83 S.W.3d at 751. Such is not the case

---

[11] Neither party sought to introduce expert testimony regarding the value of the business, and neither party argued on appeal that expert testimony was necessary.

-26-

here. The trial court weighed and evaluated all of the relevant evidence regarding the value of Rooter and adopted a valuation that was within the range of values suggested by the parties. The evidence does not preponderate against the trial court's award of $50,000 for the goodwill of Rooter, in connection with its overall valuation of Rooter at $75,000.

### C.    Reduction based on Intestate Share

In their final issue on appeal, Defendants argue that the trial court should have reduced the $75,000 judgment against Defendants by one-half because Amy would have been entitled to one-half of Decedent's property by virtue of the fact that she and Jacob are Decedent's heirs under the laws of intestate succession. The trial court's memorandum stated, "The attorneys may agree on the impact of the [$75,000] judgment, if any, as to [Amy]'s rights under intestate distribution, after payment of all debts and charges against the estate." In a subsequent order, the trial court declined to reduce the damage award against Amy, stating that "[a]ll issues as to whether or not Defendant, [Amy], is entitled to distribution from the estate of [Decedent] are reserved for adjudication in the estate proceeding pending in Maury County Chancery Court." We find no error in the trial court's decision. Essentially, Amy asks this Court to conclusively determine that she is entitled to receive at least $37,500 (one half of $75,000) from Decedent's estate and to deduct that amount from the judgment she owes the estate. However, the estate proceeding was not before the trial court; it was pending before the chancery court. Several creditors had filed claims in the chancery court, and those claims will have to be resolved, in addition to other matters, before Amy is entitled to receive anything from Decedent's estate. We therefore find that it was appropriate for the circuit court to decline to reduce the damage award against Amy, and we affirm its decision to defer any adjudication regarding Amy's share of the estate to the chancery court.

### V.    CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court and remand for further proceedings. Costs of this appeal are taxed to the appellants, Amy Sprinkle Wray and Frank Wray, and their surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P. J., W.S.